Good morning, Your Honors. My name is David Braverman, and it is my privilege to represent Hill Int'l, Inc., the appellant in this matter. I have seated, with the Court's permission, five minutes of my argument to Amicus Construction Management Association of America. And would you like to reserve time for rebuttal? I would, Your Honor, and I have requested two minutes. That's fine. Mr. Anzidi won't take any rebuttal? Correct, Your Honor. Good. Okay. Two and a half years after Hill supplied consultant Richard LaFay to Wartsila in connection with the Nahapa Power Plant construction project, after Wartsila hired Mr. LaFay directly away from Hill, after the construction project came in late and over budget, after Wartsila decided to commence an arbitration, after Wartsila decided what claims to bring in the arbitration, what claims not to bring, after it determined its trial strategy, chose its counsel, after it decided to make Richard LaFay a witness at the arbitration, it lost some claims in the arbitration and won others. Wartsila then sued Hill, seeking to foist upon Hill the liability for all of its losses in the arbitration. Excuse me for interrupting. Isn't there something that happened in between? In other words, didn't it then, before it, didn't it withdraw all the testimony of Mr. LaFay? Didn't that happen in your sequence? During the arbitration, Your Honor, Mr. LaFay perjured himself. And when that perjury was unmasked, Wartsila, in its own decision, decided to withdraw Mr. LaFay's testimony. And then? And then the matter proceeded through the arbitration, and they won some claims, Wartsila won some claims in the arbitration, and lost others. Okay, but you agree with me that that intervening step is necessary in the sequence of what happened? I think every intervening step is necessary, Your Honor, and that step included. I think the fact that Mr. LaFay perjured himself is critical, and what Wartsila decided to do in response to that, Your Honor, is also critical. Let me ask a question of you, Mr. Braverman. Yes, sir. You've asked that the judgment of the district court be reversed and judgment be entered on your behalf, if I understand correctly. And I'm having a little difficulty following the logic of that, because if I understand your arguments, your arguments are that, in essence, that the district court was wrong about the exculpatory clause, that it is enforceable, and wrong in its assessment of what is direct and consequential damages. But I don't see an argument, and I don't see how you could argue that there wasn't a breach of contract. I think you didn't argue that in the district court. You were, in fact, in saying, oh, yeah, yeah, we're not saying there wasn't a breach. We're just saying that they don't get all these other damages. So how could we reverse and enter a judgment on behalf of Hill when, at bottom, that would be saying there wasn't a breach of contract? Because it wouldn't, Your Honor. How come that? And I'll explain. We've chosen two issues on this appeal, and Your Honor has accurately summarized them. The first is that the district court erroneously found that the limitation of remedies clause, not an exculpatory clause, but the limitation of remedies clause, was unenforceable as a matter of law. We disagree. We think that it was enforceable, and it's enforceable as a matter of law and as a matter of fact under the facts of this case. Gotcha. I understand that. We also contend, and that's where we come into the second issue, that each and every element of damages asserted by Ward-Silva, in this case, are consequential damages. Well, then I guess what you're saying is that most Ward-Silva would be entitled to nominal damages, but wouldn't they still be entitled to a judgment that there was a breach of contract? How could there be a judgment for Hill? We're not challenging that there was a judgment against Hill for breach of contract and for negligence. We've accepted the jury's verdict in that regard. So you're conceding that there was a breach of contract? That's what the jury found, Your Honor. We didn't like it, but we're not challenging that on appeal. So then you'd have to say, wouldn't you, that you're not seeking entry of judgment for Hill, right? Correct. Okay. I apologize if we inaccurately characterize that in our brief. We're seeking a reversal and the entry of judgment in favor of Ward-Silva for nothing more for a dollar, or at most for $78,000. And the reason I say at most for $78,000, because that is the amount that Ward-Silva paid Hill for LaFay's time during the four-month period that LaFay worked. As a Hill employee for Ward-Silva, because if Your Honors will recall, this contract started on January 25th, 1995. Hill supplied Mr. LaFay as a consultant. Four months into that contract, Ward-Silva terminated it and hired Mr. LaFay directly as its employee. Subsequently, there were a whole series of events, including the events that Judge Schloverter talked about, where he perjured himself at the arbitration and withdrew the testimony. That's Judge Schloverter, but that's okay. Sorry. It's okay. As long as you use the right name. And don't call me Mr. I'm going to just stick with Your Honor. I think I'll do better. So the point is, first of all, that the limitation of remedies clause is enforceable under all of the applicable law. The district court confused the concept of an exculpatory clause, exonerating one from the very conduct that rises to the level of the breach of contract, saying that it would be anomalous to allow someone to breach their contract and then exonerate themselves under that clause because it would effectively render the contract illusory. I'm sorry. No, I just want to clarify. You're saying that it shouldn't be called an exculpatory clause, even though that's what the district court called it? Correct, Your Honor. You think it's the limitations of remedies? That's exactly what it is. And in the district court, in the footnote, he said that we have called it a limitation of remedies clause. He calls it exculpatory for his purposes. They're all one and the same. But for this purpose, they're not. Well, let me ask about the specific damages that we're awarding. Is there a way to tell what the jury was awarding damages on? Yes, Your Honor. How? If the court would look at page 13 of our brief and also in the joint appendix at JA254, you will see a listing of all the damages. So I've got that. But what I'm asking is how do we know what was in the mix? Is there anything in the record that would tell us this is what was in the pot, this is what wasn't in the pot when the jury came back? And gave what they gave. There is no way to determine how the jury divined the $2,048,000 out of the $7,518,000 sought. But what the court can do is look at the $7,518,000 that was sought, the universe of damages that were sought, and you can determine by looking at the universe that none of them, with one possible exception, are direct damages. Each and every one of them has to be, as a matter of law, consequential damages. What's the one exception, one possible exception? The one possible exception is on page 2. Item number 28 is what was paid to Hill International. And you'll see the sum there of $188,917. We established at trial that of that amount, $78,000 was attributable to the Lafay time. So that is the only conceivable amount that is direct damages in this case. Really, the other, the remaining part of that, you don't... Your assertion is that even though you gave them a consultant who was a sham, in the immortal words of Woody Allen, a sham of a mockery, two mockeries of a sham, that the other things that were done by Hill turned out to be good value and weren't completely swamped by the fact that the consultant offered up was bogus? Ironically, Your Honor, the consultant did a great job, too. At trial, everybody testified that during the four months that he worked on the project as Hill's employee, he performed admirably. Well, they liked him enough to hire him. That's clear. They liked him enough to hire him. I'm trying to get at your assertion that what was paid on behalf of, paid to Hill by Wardzilla during that four-month contract period, you're saying it was only the fever part that would be recoverable as general damages. Why isn't the rest of it, which was associated with the contract, not just all part of that general damage? Let's assume for purposes of this argument, Your Honor, that the entire $188,000 they paid to Hill was direct damages. We'll assume for purposes of this argument that it is. What is key, however, is that the balance of the damages that Wardzilla sought under any definition of the term consequential damages could not be direct. Okay, let me turn your assumption back on you. Assume we accepted that. I still want to know what distinction you make in that $188,000. Is there a reasoned distinction that we can think about that you can articulate? Sure. The $188,000 was the benefit of the bargain of the contract. That's what Hill received in exchange for the services that it rendered. That was $79,000. $79,000 was what, Your Honor, was paid for the lafayette time as compared to the total, which was $188,000. But the point is that that was the consideration paid to Hill for the services that it rendered. If it breached its contract, then the natural and ordinary consequence of that, the damages that would ordinarily and naturally flow from that breach would be that value. Okay, so I hear you telling me, and you tell me if I'm wrong, that there isn't a basis for saying there's some difference between the lafayette time and the rest of the $188,000, that in fact that is the bargain. And so if they were deprived of the benefit of the bargain, they were deprived of the $188,000. Have I misheard you? You haven't, Your Honor, and I'm just assuming for purposes of this argument. I think there's a rational distinction between the lafayette time and the time supplied by all of the other consultants. They had no problem with the other consultants. They all performed their services properly. Are you telling us there were other consultants beside LaFaber that Hill supplied to Wardzilla? Yes, Your Honor. Oh, I really haven't picked that up from the brief. There's $188,000 that was paid that included $78,000 worth of time for LaFay. The rest of it was for other consultants. But the point that I wanted to make, Judge Jordan, is that the balance of the damages, the additional $1.9 million or $2 million that Wardzilla was awarded by the jury in this case, by definition must be consequential damages. They were not the ordinary and natural consequence of the breach. They would not invariably flow. These are not the types of damages that would in every case follow the breach of this nature. Rather, they were special circumstances. They were things that happened in the future, decisions by Wardzilla. That's why I started my argument with the litany of things that occurred after Hill supplied the consultant, including the perjury by LaFay, the withdrawal of the testimony. All of those things, while arguably foreseeable, and I'm not necessarily conceding that, but arguably foreseeable, clearly were not the ordinary and natural result of the breach.  Yes, Your Honor. When LaFay testified at the arbitration, what was the nature of his testimony? What did he testify to? Well, he was called, and again, this was a decision by Wardzilla without notice to Hill. He was called as a fact witness to testify as to certain facts, events, and circumstances that he observed during the course of the Nahapa Project. Now, if he wasn't the person he purported to be, didn't have the engineering degrees, et cetera, did that adversely affect his testimony as to the facts that he observed? Wardzilla thought that it did because it affected his credibility, and since a fact witness, the credibility of a fact witness like any other witness is critical, they thought that since he had lied about his qualifications to the panel, to the arbitration panel, that he lost credibility, and therefore they had to withdraw his testimony. They didn't have to even present his alleged qualifications. He just did it. That was their strategic decision, and he lied. There was no way to know that he was going to lie, and he just did. He was a practiced liar. What did you argue to the jury with reference to the damages and the difference in the damages? Well, Your Honor, it's an interesting question because we raised the issue during the course of the trial with the district judge, and we said that we wanted to raise the issue of this limitation of remedies clause, and we wanted to establish to the jury that these were all consequential damages. The district judge did not allow us to present that issue to the jury, determined that it was an issue for him to decide as a matter of law at the conclusion of the case. Interestingly, in the jury instructions presented by Wardzilla to the court, they characterized all of their damages as consequential damages. Yet at the conclusion of the trial, the district judge, in what we considered to be an erroneous decision, found that the limitation of remedies clause was invalid as a matter of law, and further determined as a matter of law that the damages were all direct and not consequential. Where did they characterize them as consequential? In their jury instructions, in the joint appendix, page 44 is the docket entries. There's a citation there to the jury instructions, and if Your Honor goes to the jury instructions, you'll see that on the jury instructions relative to damages, they characterize them as consequential. They're not in the record we've got, but you're saying you could get into PACER somehow and find it, is that it? My understanding is they're in the record, Your Honor. They're not in the joint appendix, but they're in the record. They being Wardzilla? Wardzilla's jury instructions in which they characterize them. I apologize. Was that instruction given? I'm sorry. Not in the joint appendix, but in the record below. In the record below and referenced in the joint appendix through the dockets. Was that instruction given to the jury? It was not because the district judge decided that this issue should not go to the jury at all. The jury was not asked to decide the difference between the direct and consequential damages. That was an issue that the district judge reserved for himself and decided as a matter of law at the conclusion of the case. Well, I'm still not sure of the answer to my question. How did you argue damages to the jury? Did you distinguish between the damages that flowed from an unqualified person doing the consulting? We were not permitted, Your Honor. We argued before the jury the issue of proximate cause. We argued before the jury the issue of foreseeability. But we were not permitted to argue before the jury the difference between those that naturally and ordinarily flow from the breach and those that flow by reason of special circumstances. So did you argue to the jury there was no breach of contract? We did. We lost that issue. But on this appeal... Why did you argue about damages? We argued that the damages were remote. They were not proximately caused by the breach. The jury obviously disagreed with that. But that begs the question of whether or not they are direct damages or consequential damages, which is the issue that's before this court on this appeal. Before you sit down, you called our attention to page 44 of the joint appendix... Yes, Your Honor. ...which is the docket entries. Yes, Your Honor. Are you referring to number 219, Proposed Jury Instructions by Watson? Yes, Your Honor. So then that... And you say... And that would be in the record, I guess, not in the appendix... Correct. ...but in the record. Correct. And you're telling us that those Proposed Jury Instructions refer to the damages flowing from the costs that Wartsila incurred in getting new witnesses, et cetera, for the arbitration, were referred to as consequential damages. Yes, all of their damages Wartsila referred to as consequential damages. Thank you. Thank you, Your Honor. Do you have any more questions? Okay. Okay. Thank you. All right. We'll hear from the anarchist, lawyer, and you'll tell us how to pronounce it. Well, Wade and Mary, you're going to say. Good morning, Your Honors. My name is Chris Anzadeh from the Wofford & Watt Teeter Hoffman Fitzgerald, on behalf of the Amicus Construction Management Association of America. I'd like to introduce and just define the practice of construction management and then make three very brief points, unless the Court has any questions. No, you do that in your Amicus brief. Go ahead. I'll summarize very quickly. No, go ahead. It's important. I was a construction manager on this project. Construction management is a professional discipline. It's distinct from either design or the actual physical construction, what the general contractor would do on a project. The role of a construction manager is essentially to bridge the gaps between all the project players and to undertake various tasks to manage the time, scope, cost, and quality of the work. Now, it's important to note that construction managers can play a role similar to an accordion. They can perform start-to-finish services to essentially manage a project from the inception, the planning stage, all the way through closeout. Or they can provide very discrete services, narrowly tailored to the task at hand, to help out a client. And the latter situation is what happened in this particular case. Very briefly, who are the CMAA? The CMAA is the largest organization in the country devoted to the practice of construction management. It's got over 4,000 members from across the country, and they're dedicated to just advancing the practice of construction management. The three points that I'd like to make, Your Honors, are first, from the Construction Management Association of America's perspective, the role of limitation of remedies provisions in contractual risk allocation is vital. The reason for that is it is the position of the CMAA that risk in a contract should be assigned to the party that's in the best position to control that risk. Risk assigned to the party that's in the best position to control that risk. The second point, Your Honors, is there's a corollary to that, which is a limitation of remedies provisions, such as the one that we understand to be at issue in the underlying dispute here, is more appropriate to be used where there's greater risk and less control. Why is there greater risk in this particular case? Because the construction manager got involved midway through the project when it was already in a claims posture. And why was there less control? Well, because the construction manager performed only very discreet services for a short period of time and was on and off the job. And we think that those points are very important in terms of looking at the enforcement of a limitation of remedies provision. When you're looking at what costs should the appellant bear, the court should consider the extent to which the appellant controlled the risks. And I think Mr. Braverman addressed the issue of causation in his underlying argument. I don't think there's a need to go into it further unless the court has any questions. The third point, in the event that a limitation of remedies provision, such as this one, were not enforced, the district court's opinion were upheld, that would send a strong message to the construction management field, indeed the construction industry in general, as you'll see these types of limitation of remedies provision in nearly every contract across the industry, whether it's the CMAA type contracts, whether it's the AIA, the American Institute of Architects, the AGC, the Association of General Contractors. It would send a message that there's a disincentive to participate in those projects that need the expertise of the CM the most, which are projects that are already in trouble. This particular project where the CM was brought on midway through the project when it was already in a claims posture. The result, if these types of clauses are not enforced, is you're going to see CMs not getting involved at all or only getting involved at a high cost. Give us some example of what a construction manager would tell the party who hired it. Your Honor, the types of tasks... Yes, what kind of things? The types of tasks, again, they can be tailored to the particular task at hand. On a project like this that's late, a construction manager might come in and do a review of the schedule. The schedule will consist of many activities, many instances, hundreds and thousands of activities, different contractors and subcontractors, perhaps offer ways that the schedule could be revised in order to make up some of the time. The most cost-effective way is to perform acceleration, such as whether it be more advisable to add more people, to switch this subcontractor with that subcontractor, any number of things. But from the perspective of a schedule review, a construction manager might come in, and that might be a typical task, be it a new set of eyes to look at the schedule, analyze it, and attempt to come up with creative ways to try to mitigate the losses. Would you agree with me that it should be the reasonable expectation of the parties to a construction management contract that the construction manager would provide qualified professionals to do the managing? Well, certainly it would be the aspiration, certainly in any case, that qualified construction managers should be performing the work. Thank you. Thank you very much. Thank you for this opportunity.  Good morning. May it please the Court. My name is Mike Adleman. I'm with Drinker, Biddle, and Reif, and I am grateful for the opportunity to represent the appellee, Wood Sill. Excuse me. I thought you were Richard Brennan, according to my minutes. You're not Richard Brennan. I am not Richard Brennan. Did you tell the— Yes, I did, Your Honor. Okay. What's your name again, sir? My name is Mike Adleman. I'm Richard Brennan's partner. We tried the case together before Judge Roper— Are you on the brief, Mr. Adleman? Yes, I am, Your Honor. Okay. Fine. And as I said, I'm grateful for the opportunity to be here today to represent— You have to be. We put it on for argument. That's right. That's right, Your Honor. I listened carefully to the comments made by my adversary. All those arguments about intervening events and causes and decisions, those were all arguments made at the trial and rejected by the jury when the jury found that Hale had committed negligence and had breached the contract. Well, we just heard your opposing counsel say the district court didn't let us make an argument about consequential versus general damages. The district court said, I'll make that decision as a matter of law. Are you just wrong about that? That was my agreement amongst the parties and the court. That issue as to whether the exculpatory clause had any applicability to this situation where Wartsilla got a charlatan, we got a man who did not have the degrees or the credentials set forth in the resume that Hale gave us. And we know the facts. Thank you, Your Honor. I'm trying to get at the— I hear on behalf of Hale, Mr. Braverman saying, we were not permitted to make an argument to the jury about what would be consequential and what was direct and what wasn't. And I hear you saying that they never made an argument because it was by agreement. I'm just trying to get the procedural facts. I was there, and it's certainly my understanding and my recollection that it was agreed that the issue of whether the damages awarded by the jury somehow would be lessened or removed by virtue of the limitation of liability or exculpatory clause, it was agreed upon by counsel and the court that that issue would be heard by the court as a matter of law. Did the court first say—because I've called for the record, and we're going to get it hopefully to my chambers as soon as possible. Did the court say this is a legal issue? Yes. Okay. And then after the court said this is a legal issue, then the party said, okay, if it's a legal issue, then okay, then we can't try it before the jury. Is that right? After that—I think Judge Jordan is getting at how did it come about. It came up—Hale had certainly argued that we were not entitled to any of the damages that we were seeking. Okay. And the jury obviously disagreed with that. Judge Jordan is getting to the point before it got to the jury. Right. Let me try this one more time, and I apologize if I'm not being very clear. The district court at some point made a determination that the exculpatory clause was just that. It was exculpatory and therefore going to be unenforceable. But at some—presumably before you got to the jury, there was a discussion about what was and wasn't going to be put before the jury. If the exculpatory clause had been treated as a question of limitation of remedies, then there would, I presume, have been some presentation of evidence to the jury about what the various categories of evidence that Wardzilla presented were to the jury in terms of foreseeability and whether they were a natural consequence. Even though those might ultimately be questions of law, somehow the jury would be informed so that you wouldn't have at the end of the process some pot of money in which nobody could say, well, it contains this or it doesn't contain that. So maybe I'm mistaken about that, but because we don't have any accounting of what the jury was saying is in the pot or out of the pot, I'm assuming that Mr. Braverman may have it more accurate and you all were just told it's a question of law, we're not getting into it. But I want you to help me out if I'm wrong about that. No, and as I said, we argued at the time of the trial that all of the damages flowed naturally and foreseeably from the breach of contract and from the negligence. At the end of the trial, there was a discussion with the court at the time that the court was preparing the jury charges, and the agreed upon jury charges are part of the joint appendix. They do not break out any segregation in terms of the damages. The jury was asked to award a number if it found that Hill had breached the contract or had committed negligence. It was decided that the question then as to whether the exculpatory clause had applicability was a question of law that was agreed upon by counsel in the court, and thus the motion to mold the verdict was made after the case. And that's why we're here today. Did you, in your proposed jury instructions, categorize the damages as consequential damages, as Mr. Braverman said? I believe that we did, Your Honor, but it's of no moment. And I'll tell you why. Those instructions were never given. Yeah, but you characterized, you considered them to be, I guess Mr. Braverman would argue, you considered them to be consequential damages because you so categorized them. I'm not arguing with you, Your Honor. You're not arguing? No, my point is this. The document that we submitted speaks for itself, and it says consequential, but Mr. Braverman is giving an accurate description to the court. But you just said that it's of no moment. Yes, it's of no moment. That's correct, Your Honor. Do you know about the Doctrine of Judicial Ensemble? Of course I do, Your Honor. It looks like you've taken a position before the trial court that they were consequential, and before us you're taking a different position. The essence of our position, Your Honor, is that the entire clause has no applicability to this case. Well, then, what you're saying, if I understand it, is that if we agreed with the district court that the clause was against public policy and no effect, you win. But if we disagreed with you, you would, and it should be given effect, that you would lose because you've already acknowledged that the damages are consequential. Have we heard you right? No, well, the court didn't agree with our view that they were consequential. The court ruled that they were direct damages. Yeah, well, I don't know that that assists you in getting out of a judicial admission. Well, as I said, the document says what it says, and we're all going to get the document. Is it a legal issue whether the damages were direct or consequential? Yes, it's a legal issue that was decided by Judge Rodriguez and on which we are seeking his affirmance. Okay, and that means that we, as judges, review legal determinations, as appellate judges review legal determinations de novo, and that we can decide whether the damages that flowed from the decision by your client to redo the arbitration, were the damages that flowed from that were consequential or direct? That's correct, Your Honor. Okay, that's just fine. I want to emphasize the point as to why we think that the clause has no applicability here. There are two basic reasons. We were induced to enter into this contract by virtue of a falsehood. Didn't you lose the fraud claim in front of the jury? We did lose the fraud claim. However, we prevailed on the negligent misrepresentation claim, and so we were still deceived into entering into the agreement. Now, that's a very interesting point when you say negligent misrepresentation, because looking at your complaint, the negligence count in your complaint, which is pages 191 and sequence in the joint appendix, it talks about your relying on their having made you certain misrepresentations. That's what you're saying is the negligent misrepresentation claim in your case? Yes. In other words, we received a proposal that contained the resume of Mr. Lefebvre, and in that resume, prepared by Hill, it indicated he had degrees and licenses that he didn't have. Do you have any authority for the proposition that if there's no fraud in the inducement that that makes a contract? Sure. Under the Martins decision, which we cited and was discussed in the briefs, a party can induce another, even negligently, to enter into the contract. But you can't then say, well, now that we've gotten you into the contract and the misrepresentation has been exposed and you've been damaged, now we're going to hide behind the exculpatory clause. Hold on just a second, because I think I just saw that rabbit go back in half. If the contract is enforceable, because that was the premise of what you just said, that, okay, we're in the contract, then if you're in the contract, why is that exculpatory clause by itself not in the contract with everything else that's in the contract? I'll tell you why. Two basic reasons. One, that clause essentially would allow Hill to provide us with a charlatan and then walk away from the contract without any damages.  Or just without any consequential damages? Well, no, let me tell you why. Because the contract says that that limitation of liability or exculpatory language or limitation of remedy clause applies only to the services that Hill was going to provide. It says that this limitation goes to the performance or non-performance of the enumerated services. Those services are set forth in language that Hill prepared. And that's project management, scheduling analysis, construction planning, resource evaluation, the construction progress, evaluating subcontractors and their performance. Did he perform them adequately in the four months while he was still employed by Wärtsilä? Everyone testified at trial that he did. And based on his performance, Wärtsilä then hired him directly, right? Right, and these were arguments that were made. That's right, and these were arguments that Hill made before Judge Brotman that were rejected, that they said, well, any liability has to be cut off after Wärtsilä has now... But Judge Brotman is making a legal determination that we can review. Sure, and Judge Rodriguez, the same argument was raised before Judge Rodriguez and rejected... Well, our question is, were they right? Yes, they were right, and here's why. Because Hill owed us a duty even before the contract was formed. They owed us a duty as they owed any of its potential clients. And Mr. Braverman says, okay, the jury, we don't agree with it. The jury found that we breached the contract. But the issue before us is what kind of damages flow from that jury determination. And you're telling us that we should not even consider the clause in the contract to which you agreed that says that the damages are a limitation of damages. Yes, and the clause should not come into play. You think it's against public policy? I think it is against public policy, and in fact, even the head of Hill, Urban Richter, testified that something like the accuracy of the resume would never make its way into the contract. Of course, Hill holds itself out as... Wait a minute, wait a minute. We have to go back. Excuse me, but if it's against public policy, do you agree with the statement of the amicus that this clause is in many, if not most, similar contracts? Yes, I listened to the argument made by counsel for the association, and in fact, one of the things that he said was that the risks should be assigned to the party best able to control them. Now, that's the rationale. Let's go back to the question I asked. And you didn't have to wait for that because you got his brief, and his brief says that this clause is in many, if not most, I guess most, similar contracts. Now, you're telling us that that clause is against public policy? I'm telling you that adhering to that clause under these facts, and these facts are not being challenged on appeal. That's not what Hill is doing. But on these facts, where the very essence of the contract was breached, it would be against public policy to uphold an exculpatory clause on these facts. My client uses limitation of liability clauses. This case is not about our attack on limitation of liability clauses in general. It certainly sounds like it may be because the district court, and actually let me ask you this because I wasn't sure I followed district court on this one point. District court said this is void, it's unenforceable, it's against public policy. And then went on to say, well, these sorts of things are consequential, and these sorts of things aren't. If it was not enforceable, what was the point of talking about consequential versus general damages? The point of that, Your Honor, was those were arguments that Hill had advanced. Was it an alternative holding by the district court? I think it was a secondary holding. I think the primary holding is what I said. Well, stick with me. Sure. Do you concede that as a matter of logic, if the clause is unenforceable, then there's really no point in going through the exercise of saying that? Yes. I agree with that. Was that your position in the district court, that the clause is unenforceable? Yes, Your Honor. And therefore, it doesn't matter whether you call them direct or consequential damages? That's also correct because, again, the jury found a breach of contract and negligence. And so on the particular fact, this is a unique case. This is a situation involving a false resume. And the way this unfolded is not something that I think either party has been able to find another case where this type of scenario took place, especially considering that Hill is in the business, as they testified, of supplying credible people. Credibility is the key in these disputes. But that goes to the question of breach, doesn't it? Not whether the clause is enforceable. The reason that it goes to whether the clause is enforceable is because it goes to the very essence of the contract. That's why Judge Rodriguez used the horse and cow analogy, that you go to buy a horse and a couple of days later you find out that there's no horse, there's a cow. The whole contract has failed of its essential purpose. That's the part that is crucial. And I think it was crucial to Judge Rodriguez. Is it possible for a reasonable person looking at this record to conclude that Ward Silla overreacted when it learned that Lefebvre had falsified his qualifications in light of the fact that everybody said that what he did on the job was adequate and nobody has yet said that his testimony up to the point where you withdrew it was itself incredible, just that he could be attacked for being a liar and a sham. Was it necessary to just, could you have just said we withdrew his testimony, but let's proceed because this is with respect, it doesn't matter for this purpose. You couldn't have done that. No, you're right. I don't think Ward Silla overreacted. But $7 million, it was $7 million that had cost to redo this and the jury only gave you two? The lion's share of that was the award of $5.5 million in terms of a settlement that was ultimately reached. There was an award made to BVI of just under $5 million. What did that have to do, was that the direct result of Lefebvre's testimony? I mean that was as a result of an arbitration wasn't it? There was no trial. There was an arbitration between BVI and Ward Silla, right? That's correct. Did Lefebvre testify at that arbitration? That's the arbitration that we're talking about. In fact we had an expert come in and describe the effect of Lefebvre's perjury on the panel, on the decision makers, that is unchallenged on appeal. Can I just add one more point to the question that was raised about whether Ward Silla overreacted? Because what also happened at the time that this, when you say he committed perjury, what he did is he testified that the Hill resume was accurate. And then what happened is that Hill sent another resume that contained similar inaccuracies. Now at that time there can be no argument that there was any contract in place. There were no exculpatory claims. Of course not, because he was your witness. Right, but Hill still had a duty to provide accurate resumes. You can't just send out and represent to the world on Hill stationary that this man has credentials and degrees and licenses that he doesn't have. Jordan has a question. I apologize, I just wanted to... Your negligence theory, I want to ask about that. Is there, the sole basis of your negligence theory is that the, that Hill failed to perform as promised under the contract because Lefebvre wasn't who he purported to be? No, that's not entirely correct, Your Honor. The essence of our negligence claim is that Hill had a duty to provide us with an accurate resume, and Hill breached that duty. They breached it not once, but twice. They breached it at the time that they initially gave us the resume from Mr. Lefebvre, and they breached it again during the arbitration when the issue had arisen. Mr. Lefebvre contacted Hill, and Hill sent another resume. The damages that would flow from that alleged breach, they precisely mirror the damages that you allege flow from your breach of contract claim, right? Yes, that's all I'm asking. That's correct. Good. Thanks. Okay. Thank you. Okay, any questions? No. Okay, thank you very much, Mr. Edelman. Thank you. Mr. Braggerman, I think you've reserved two minutes. Thank you, Your Honor. On page four and five of the district court's decision found at J8 and J9 of the joint appendix, the court indicates that during the pendency of the trial, the applicability of the exculpatory clause contained in the consulting agreement was brought before the court. The court reserved judgment on the issue so that it could be considered in light of the jury's findings. The court did not allow the parties to parse through the issue of consequential and direct damages. That's how it was arisen, how it arose, I'm sorry, and it was not by agreement of the parties. Judge Slogan, there is an issue that I want to address to some comments that you have made. If you look at the- Hopefully questions, not comments. Questions, Your Honor. Okay. If you look at the list of damages that Wartsila supplied, you will see that there is nothing relating to replacement witnesses. In fact, the testimony at the arbitration was that only one witness was brought on as a replacement witness, and that was Juan Radulovic, and there was a small amount of money attributed to him because he was already a witness at the arbitration. They withdrew LaFay's testimony at the arbitration. They got a continuance, and then they went and proceeded to put on the balance of their case so that the concept that the world was set upside down because LaFay's testimony was withdrawn, A, it was their decision, and B, they continued on with the case. Then help me because I thought I read that they had to scour the world, I think that were the words, to find witnesses. Where did all this- How did it get- Leaving aside the 55, whatever the amount was, how did it get to the $2 million? What caused the $2 million? And that, Your Honor, I meant to bring it up, but if you look at it, there's AAA fees, 60-some thousand. I'm making up that number, I know the number. Court reporter fees, hotel bills, $110,000 to the Doubletree Hotel. They would have spent that money whether Mr. LaFay lied or didn't lie. These were all arbitration expenses. There were telephone bills, restaurant bills, court reporter fees. That's the point when I wanted to bring up these damages, the list of damages to the court, to show you that these are all damages that arose out of their decision to arbitrate. How long was the break in the arbitration while Wartsila pulled its case together? About two weeks. Two weeks? Yes, sir. Yes, ma'am. Thank you. And the last point that I want to make, and it's fundamental to our whole argument, and that is that this is a limitation of remedies clause. It's not an exculpatory clause. It's not titled an exculpatory clause. And it requires that one parse through the damages to see whether they are direct or consequential. Do you believe Maryland law applies? Yes. There's no question? No, Your Honor. Okay. With respect to the interpretation of that contract, we agree. What was the total amount of the judgment that the court approved? Money damages. In the lower court, Your Honor? Yes. It was $2,048,000. Now, did the court, after the jury came in with that amount, is that the amount the jury came in with? Yes. Did the court go through each item, like the hotel bill and so forth, and say that is direct and not consequential? No, Your Honor. What did the court do? The court instructed the parties to file their post-trial motions with respect to the issue of the exculpatory clause and said that if the issue of consequential versus direct damages becomes relevant, should he determine that the clause itself is enforceable, he'll make the determination as to what is or isn't direct or consequential. Well, did he indicate that all the damages were direct damages? He did, Your Honor. Okay. Thank you very much. Thank you. We'll take this matter under advisement. Thank you, gentlemen.